Good morning. My name is Armina Ibrahimian. I'm with Soy & Associates for the Petitioner. Could you just pull the mic down a little bit and try and speak into the mic so we can hear you? Yes, sorry. My name is Armina Ibrahimian and I'm the attorney for Sean Yoon Hee, the Petitioner with Soy & Associates. And this is my first time. I'm a little nervous. Sorry. Okay. Well, just keep your voice up. Okay. Should I just get right to it? Yes. Okay. So the key issue in this case is whether the Petitioner was persecuted based on other resistance to China's coercive population control program. The Petitioner was found credible and the key issue is whether the – well, first the immigration judge found that there was no resistance and then the BIA jumped right to whether he was persecuted. My position is that the immigration judge erred by stating that there was no resistance. Her decision lacked any analysis. She just jumped to there's no resistance and denied the claim, citing only one case. And now we have a more recent case, a very strong case, Jiang v. Holder, and that case basically says that if the person is found credible and there is a forced abortion and also other resistance, then basically that's enough for a grant of asylum. What does it exactly say, that? I don't know. It says that it can be a factor. To be considered, yes. Jiang. Isn't that what Jiang says? Yes, yes. Right, right. So what was the forced resistance here? Okay. In this case, the Petitioner basically – seven officers barged into their home and attempted to drag the wife away. He tried to stop them, but he was pushed down to the – he was thrown to the floor. Two officers jumped on him, held him down to a point where he couldn't even move, as he basically pled with them to not drag his fiancée away, and to a point where he couldn't even move and she was dragged away. His testimony is clear. He did make it very clear that he didn't want them to take her away. And even after the abortion, she was instructed to appear to have an IUD inserted, and it was his position that no, that's not going to happen. He's basically resisting through and through. His testimony was very clear. He was not married, though. No, he was not legally married. And he was not even traditionally married, according to the record. Actually, they did. They did have a ceremony where they exchanged gifts. No, they didn't say that. Be careful of the record. Okay. And I think Jian and Wen, there indeed was a traditional marriage ceremony. In this case, he didn't say that. He said, I gave a gift, and we were a couple. And they said, were you married? And he said, no. He never said we went through a traditional marriage ceremony. Now, you know, when people get engaged in our country, for example, very often the man gives a gift called an engagement ring, and we can say they're a couple, but they aren't married. No, they're not married. They were engaged. And he never said that he was married, did he? They were engaged, and they were considered a couple. He did say that she came to live with them. That makes a big difference, doesn't it? We have no case so far that says somebody who's not married can take advantage of being a spouse. Interestingly, the BIA didn't make that an issue. If you read the last part of the BIA decision, that was something that was raised because we did want the case law under Amah v. Ashcroft to be taken into consideration. And the BIA didn't the BIA did say that's not a factor. The BIA said he wasn't married. Right. But that that wasn't a grounds for denial. Doesn't it say besides or something? I'm looking for the exact language where we speak here. But didn't it say something like, in addition, he wasn't married? No, it was just one of the factors that was thrown in. Well, but then the BIA mentions it. It says he was never married. Yeah, I know. Never married. We're not claiming that he's married. No, I'm asking whether or not the BIA your position is that the BIA didn't rely on it. And it looks to me like it's one of the factors the BIA relied on, isn't it? It's not the factor in the denial, the dismissal. No, definitely they were not married. They were a couple. She was his fiancée. And definitely that relationship was established. We have no case that says fiancées are covered, do we? There's one case that the matter of J.S. does also talk about if there's a boyfriend-girlfriend relationship. Our position is that maybe they were not legally married, but under MAW, if they're – I'm sorry, Your Honor, I'm a little nervous. I'm going to just look at my notes. No, take your time. But here's the question. If they're not legally married and they're not traditionally married, which is what the John case is about, I think, is there any case that allows us to extend asylum on these grounds or withholding removal on these grounds if they're just simply boyfriend and girlfriend, if you will, which is the way that's described in the immigration judge's decision? I want to read the language. I believe it was a matter of J.S., but it does also talk about boyfriends and girlfriends. Let me just locate it. You think it's in the matter of J.S.? I believe so. Okay. Actually, it's a matter in resll. Okay. So in the analysis section, it doesn't say, okay, that with the case-by-case approach grounded in other resistance, clause of section 101A42 of the Act. So under this approach, an applicant claiming persecution based on abortion forced on spouse, girlfriend, or fiancé would have to show he was targeted for persecution on account of his resistance. Slow down. You're talking so fast, I can't understand you. Sorry. So tell me what case you find it in and at what site. It's in resll, and specifically page 3 on the bottom section in the analysis section. In the BIA's decision in this case, they cite to SL and to J.S. Okay. They say in the second paragraph, from what I can tell, they say unmarried applicants claiming persecution relating to a partner's coerced abortion or sterilization can only qualify for asylum if they can demonstrate that they have been persecuted for other resistance to a coercive population control program. Which case are you referring to? That's in this case. And it's also in the second paragraph in the BIA's decision, which they cite the case you just cited. And they cite J.S. also. I'm just saying that it's not entirely clear to me that the BIA has foreclosed the possibility of a nonmarried individual seeking or obtaining asylum under the circumstances that we have in this case. Right. Judge Fernandez is correct. There is no Ninth Circuit case law. There is no ‑‑ I believe that if you read all the case law and take everything on ‑‑ one moment. Well, the second question really is whether he was persecuted. And the difficulty, it seems there is a difficulty. In the cases that we have, generally a lot more has been done to the person than was done here. The person's lost jobs. The person's been ‑‑ the only thing that happened to this person, if I understand it, is that he was, when he tried to stop them, they held him down as they took the lady off. And then he decided that he would go with her because she was not feeling very well. He went with her when she left town. Right. I understand what you're saying, Your Honor. But I believe that with Jiang, as long as we can show the abortion and we can show the other resistance, what Jiang is stating is very clear, that as long as there is the abortion and there is the other resistance, that then we have a strong claim. That's my understanding. So is it your position that your client is an unmarried partner of the woman who was forced to undergo the abortion and it really doesn't matter whether they went through a traditional ceremony or not? Is that your position with respect to marriage? Our position is that they were officially together, that they did, that there wasn't exchanging, there was a dowry exchange and that she did move in with her for all intended purposes. So I think the answer to my question is yes. Yes. They were a couple and they were together and he did suffer persecution because his unborn child was forcefully aborted from the love of his life as he did resist. Your time is running out. Yes. I'm sorry. Let me ask one more thing here. Is there any persecution in this case other than the persecution related to his protests about the abortion? I'm sorry, say that again. Is there any persecution in this case other than the stuff that you told us about related to his protesting against the abortion? It's our position that the fact that he was thrown to the ground, to officers. But you told us about that. I'm just trying to find, is there anything else? I mean, persecution is not only limited to the physical. We do believe that there was also, there's a humanitarian argument and he was, what he went through was a, he was tormented and he was emotionally tortured. So we would like for all that to be taken into consideration as well. And one more thing I'd like to add is that this case for some reason wasn't referred to mediation and I'm not sure why not, but that might be one option too for us to. Thank you. Thank you. Thank you. Good morning. May it please the Court. My name is Paul Stone. I represent the Respondent Attorney General of the United States. The primary issue before the Court is whether or not Mr. He was persecuted in the past on account of his other resistance to China's coercive population control program. What does other resistance mean? As opposed to resistance.  And what's stated earlier in the statute is people who undergo forcible abortion are per se entitled to asylum. For the spouse or a partner, put aside a second the unmarried issue. What is the nature of the other resistance that might satisfy the statutory requirement? Well, both the Board and the Court have noted the other resistance is not defined in the statute. I know. That's why I'm asking. That's why I'm asking. Why do you think the other resistance in this case doesn't qualify and what would qualify? Well, the reason for that, Your Honor, is analogizing. We have to analogize to other cases where they've found other resistance to be sufficient. For example, Jiang. In Jiang, the level of resistance that was found to be sufficient was there was a long history of the petitioner resisting the population control program and then being retaliated against by the government. And it began back when he was in school. He was actually kicked out of school because he was involved in a romantic relationship that was prohibited. Afterward, he later attempted to obtain a marriage license and he admitted that he had moved in with his girlfriend. So here the most compelling evidence seems to be, if I can understand it, that the petitioner, when they came to take his girlfriend away, tried to resist and he had to be held to the ground by the officials. Is that not other resistance? That may constitute other resistance. It isn't clear exactly what he did. He testified at one point on page 81 of the record that they didn't actually let him resist, which makes this look like standard operating procedure. When you come into some, for example, the police come into someone's home to arrest someone, they take control of the area to make sure that nothing happens and nobody does anything to harm them. He had struggled against the police. That would constitute resistance. But if he lies passively, it's not? I think that's correct. I thought he testified that there was a struggle. What he testified is that they held him down. And, again, on page 81 he said they didn't let him resist at any point. He did say he did ask them not to take his girlfriend and for the first time said he wanted to marry her and wanted to keep the baby. So that could potentially constitute other resistance. I think the real issue for decision is whether or not he actually suffered persecution on account of whatever other resistance he had engaged in. And when you compare it with what happened in Jiang, it doesn't rise to that level. Because, as I was saying in Jiang, after they had arrested him for admitting he was illegally cohabitating, they detained him for a day and they released him only after he paid a heavy fine. During that day they had forcibly given his girlfriend a forcible abortion. And then later they decided to get married anyway in a traditional ceremony. On the morning of the traditional ceremony, 10 local officials and police officers came to arrest them again. So there was this long history going back to when he was in high school of resistance and then retaliation that the court ultimately said rose to the level of persecution. In this case, again, there was the one incident. Well, there's also in his testimony, testimony that officials kept coming to the house. This wasn't the only incident. They kept coming to the house to enforce and they wanted to insert an IUD and they protested against that. And his girlfriend, he didn't... His girlfriend at that point was living with his family and him. Right, and they actually had left to another town. Because they felt like they had to flee. Well, she wanted to leave because she didn't want the IUD. He went with her because she was sick. She was feeling sick. He didn't actually say he went with her because he didn't want her to have the IUD inserted. He went with her because of concern for her physical well-being. What's the government's position on an unmarried, but I guess in the United States we would call them significant other couple? What's your position on whether or not a spouse in that circumstance can qualify for asylum? A non-spouse can still qualify for asylum, but the issue is still whether they engaged in other resistance and whether they were actually themselves persecuted on account of it. The difference now is that they can't claim asylum simply because they're significant other under one deforced procedure. That's what the law used to be. That's what the law used to be. But that's true for a spouse, too. That's true for everyone, Your Honor. So why does the BIA emphasize that this couple was not married in its decision if that's not relevant to the end? I think it's merely one factor among a number. For example, in Chiang, they actually tried to get married, and that was important. In this case, they got engaged, but they never tried to actually get married. You know, it's not a deciding factor. It's simply a factor. So what do you know in our recent, in our case in Chiang, we made it pretty clear that the forced abortion was to be a factor in determining whether or not the applicant suffered persecution or was involved, you know, whether there was some resistance, other resistance. Right. Did the board actually take that into account when it made its determination? No. Chiang hadn't been decided by our circuit at that point. Right. Chiang had been decided about eight days before the board decision, so it's not clear that they have cited it. They had relied on, you know, the prior. Right. They rely on the other resistance. They cite JS. Right. They rely on the other resistance concept, which existed then and still exists now. And for unmarried couples, it was applied previously. There was just a per se rule for married. They didn't, the board didn't explicitly say that it mentioned it, but it discussed the entire, all the events surrounding the enforced abortion. It talked about how he was. But we know the IJ didn't factor it in, right? Right. I'm sorry? We know the IJ didn't have the benefit of. Well, the IJ, the IJ went on the other resistance, went off on the other resistance issue as opposed to the past persecution issue, and the IJ didn't explicitly discuss it in the elements, but the IJ discussed it in the background and the facts. So the IJ was aware of it and had considered it. But, again, when looking at a case like Chiang, there is a difference in the harm that they suffered at the hands of the government. Both Chiang, he'd actually been arrested for a full day, as well as the long period of resistance and retaliation. In this case, he was held temporarily while his girlfriend was taken away, and he didn't suffer significant lasting harm, which. Is that a requirement for persecution? It's not a requirement, Your Honor. And that just goes to the other case that the Petitioner relied on in the blue brief that I don't think is, really initiates the Kwan case, which is a traditional idea of persecution is usually harm, significant physical harm. But in cases like this, there's not necessarily that level of significant harm. Like in Chiang, I don't think he ever testified that he was physically harmed other than being arrested and held. Before your opponent sat down, I think she mentioned something about mediation. Has there been mediation in this case? There hasn't been in this case, Your Honor. The government wouldn't object to it if the court would like us to do that. But it hasn't been done at this point. So I'll just sum up, unless there's any other questions, Your Honor. So at bottom, the core issue is whether Mr. He was persecuted in the past. The evidence doesn't compel this conclusion, because unlike in Chiang, he didn't have a long history of resisting and being retaliated against by the government. Here, it was relatively short and unique. And I thank you for your time. Thank you. Well, you went over your time. Is there something you feel like you need to tell us? You get 30 seconds. Okay. So in Chiang, the Court clearly said that forced abortion or sterilization is in itself proof of the fact that the prisoner was persecuted, and that ---- Okay. We've got that.  Got it. Thank you. Thank you. Thank you, counsel. Thank you. Safe trip back to D.C. Thank you. We appreciate your arguments. The matter is submitted. Thank you.
judges: Fernandez, Paez, Hurwitz